## ARGUED AND DETERMINED

### IN THE

# COURT OF APPEALS

#### OF

## MARYLAND.

---

JAMES STEWART'S LESSEE *vs.* ROBERT JONES, of GEORGE.
*E. S. June*, 1836.

J. S. died in 1797, intestate, and seized of two parcels of land, which had descended to her from her father, leaving an only brother, her heir at law. Upon his death without issue, and intestate, it was *Held*, that though the descent from his sister to him was an immediate descent, according to the principles of common law, it was also mediate from the father, from whom the brother derived his inheritable blood; and was therefore a descent upon the part of the father, and embraced by the act of descents of 1786, ch 45.

Though according to the principles of the *English* law of descents, the descent from brother to brother is immediate, and title may be made by one brother to another, without mentioning their common ancestor; yet such ancestor is regarded as the fountain of inheritable blood, and consequently the descent is mediate from him.

The legislature of this *State*, by the act of 1786, ch. 45, changed the *English* common law of descents in many of its essential features, and imparted new inheritable capacities unknown to that law. On failure of lineal heirs in the descending line, if the estate descended to the intestate on the part of the father, it directs that it shall descend to the brothers and sisters of the blood of the father, without discriminating between the whole, and the half bloods; showing manifestly, that though the descent is immediate from the person who died seized, the inheritable blood is derived from the ancestor, from whom the estate descended to such person.

1      v. 8

Distinction pointed out between the case of *Stewart's lessee vs. Evans,* 3 *Har. and Johns.* 287, *and Hall vs. Jacobs,* 4 *Ib.* 245, and the decision in the latter case, shown to be founded upon the circumstance, that the estate was acquired by purchase, by the party from whom the descent was traced

APPEAL from *Somerset* county court.

This was an action of *Ejectment* for a tract of land called " *Dashiell's Lot,*" lying in *Somerset* county, containing seventeen hundred and forty acres, and a tract called " *Stevens' Folly,*" brought on the 26th August, 1833, by *James Stewart,* as lessor of the plaintiff against *Robert Jones, of George,* the tenant in possession. The 1st count was for an entirety, the 2nd for an undivided moiety, and each was upon a demise from the 31st December, 1832. The defendant pleaded not guilty.

At the trial of the cause, the plaintiff to support the issues on his part, offered and read in evidence to the jury three statements of facts, signed by the counsel for both plaintiff and the defendant, which were as follows, to wit:

" In this cause it is admitted, that a certain *Col. John Stewart,* of *Somerset* county in the *State of Maryland,* in his life-time, was seized and possessed in fee of the land in the declaration mentioned, and being so seized and possessed thereof, in the year 1794, died intestate, leaving a son called *Alexander,* and a daughter called *Jane,* of full age, his only children and heirs at law ; that the said *Jane,* after the death of her father, employed an overseer and cultivated the said land, and received the issues and profits thereof until her death ; that the said overseer acted and managed the said land entirely under her direction, without the control or interference of any other person, and the wages of the overseer and expenses of iron work, in carrying on the said farm were paid by the said *Jane,* during her life-time. That her brother *Alexander Stewart,* after the death of his father and during the life-time of the said *Jane,* held and occupied all the other lands, of which the said *Col. John Stewart,* his father, died seized and possessed, of greater value, and cultivated the same, and received the issues and profits thereof.

That the said *Jane,* sometime in the year 1797, died in possession of the said land as above stated, intestate and without issue. That upon the death of the said *Jane,* the said *Alexander* her brother, entered upon and took possession of the said lands called " *Dashiell's Lot,*" and " *Stevens' Folly,*" and being so seized and possessed thereof, and also of divers other lands, died intestate in the month of July, 1810, leaving the following collateral relations on the part of his said father, to wit: children and descendants of *William Stewart,* deceased, who was the only brother of the said *Col. John Stewart,* the intestate's father, to wit: *John Stewart* his oldest son, now dead, *Betsey Evans* his daughter, and wife of *James Evans, William Stewart, Nancy Stewart, Molly Dashiell,* and *Robert Stewart,* sons and daughters of the said *William,* the uncle of the intestate, all of whom except *John,* the eldest son are admitted to be in full life. Also the descendants of *Betsey Wailes,* a deceased aunt of the intestate and sister of the said *Col. John Stewart,* to wit: *Helena Collier,* her daughter, and *Daniel Wailes, John Wailes,* and *Betsey Bounds,* her grandchildren, who are admitted to be living; also the descendants of *Nancy Porter,* a deceased aunt and sister of *Col. John Stewart,* to wit: *Clement, David,* and *Levi Cathell,* and others, her grandchildren who are also admitted to be living; and also the descendants of *Sarah McMurray,* a deceased aunt, a sister of the said *Col. John Stewart,* to wit: *William Russell, Josiah Russell,* and others, her grandchildren, who are also admitted to be living. That the said *James Evans,* husband of the said *Betsey Evans,* previous to, and at the death of the said *Alexander,* superintended and acted as overseer for the said *Alexander,* residing in the mansion house on the said lands, with his said wife and family, and after the death of the said *Alexander,* continued with his wife and family to reside on, cultivate, and possess the said lands, and to receive the profits thereof until the year 1814, and after that time the said lands have been held and possessed by *George Jones, of Robert,* and since his death by the defendant. That after the death of the said *Alexander,*

the said *James Evans* and wife, being in possession of said lands in the declarations mentioned, claiming the same on behalf of themselves, and the aforesaid collateral relations of the said *Alexander*, as heirs of the said *Alexander*, under the act of Assembly to direct descents, the aforesaid *John Stewart*, father of the said *James Stewart*, the lessor of the plaintiff, at April term, 1811, of *Somerset* county court, instituted an ejectment against the said *James Evans*, for the recovery of the same land, as heir at common law of the said *Alexander*, and at the same term judgment of *non pros.* in the said suit was entered against him in favour of the said defendant. That from the said judgment so as aforesaid rendered in the county court, the plaintiff appealed to the Court of Appeals, and at June term of said court, in the year 1812, the said Court of Appeals affirmed the said judgment. And it is agreed, that the record in said case in said Court of Appeals is to be taken and considered as a part of this statement of facts. And if this case should go to the Court of Appeals, the said original record may be read as a part of this agreement. It is further agreed that the said *John Stewart*, father of the said *James Stewart*, lessor of the plaintiff, died sometime in the year 1817; that *James Stewart*, lessor of the plaintiff is the oldest son of the same *John Stewart*, deceased, who was the eldest son of the said *William Stewart*, deceased, who was the only brother of the said *Col. John Stewart*, deceased, who was the father of the said *Alexander Stewart*, the intestate.

It is further agreed, that the defendant may under the issues joined, and without surveys, plats, or locations, give evidence of the possession (of himself, of the said *George Jones*, and those under whom he claims,) of the said lands, so as to avail himself of limitations as a bar to the plaintiff's recovery. And it is further agreed, that each party shall be at liberty to offer any further or additional testimony in this cause, notwithstanding this statement and agreement. And it is further admittted, that it was proved by a competent and credible witness, at the trial of this cause, that the sale

of the said *Alexander Stewart's* lands, was made by the said commissioners in October, 1813. It is further admitted, that the said lands in the said declaration mentioned, have been enclosed by fence, continually, from the time of the death of the said *Alexander Stewart*, to the present time. That after the said decision in the said Court of Appeals made at June term of said court, in the year 1812, *Helena Collier*, one of the collateral relations of the said *Alexander*, filed a petition in *Somerset* county court, for a division or sale of the real estate of the said *Alexander*, under the provisions of the act of Assembly to direct descents; that in the said petition the collateral relations of the said *Alexander*, are particularly enumerated and are the same as hereinbefore set forth; that on the 27th October, 1812, a commission issued upon order of court pursuant to the prayer of the petitioner to five commissioners, to wit, &c., to make a division of the said *Alexander Stewart's* real estate, among the aforesaid collateral relations according to their respective proportions, or in the event of the said estate not admitting of such division without loss and injury to all the parties entitled, then to put a valuation upon the same, and make a report of their proceedings to the said court. That the said commissioners having first qualified, entered upon the said commision, and on the 6th of November, 1812, reported to the said court, that the said real estate of the said *Alexander*, would not admit of division among the several and respective heirs at law of the said *Alexander*, without loss and injury to all the parties entitled, which said report and judgment of the said commissioners was finally ratified and confirmed by the said court. And the several heirs entitled to take the estate at the valuation of the commissioners, having refused to take the same in open court, it was ordered by the court, that the said commissioners make sale of the said real estate. And it is further admitted, that the said commissioners did make sale of the said real estate, and that a certain *George Jones, of Robert*, became and was the purchaser of the lands in the declaration mentioned, at the said sale, at and for the sum

of $12,738 46¾, that he complied with the terms of sale and gave his bond according to the order of the court, and afterwards paid the full amount of said purchase money. That on the 5th of April, 1814, the said commissioners made report of the said sale, and that the same was afterwards by the said court ratified and confirmed in all things at November term, 1814, no objections, &c. That after the said sale the said *James Evans and wife*, on behalf of themselves and the other collateral relations of said *Alexander*, delivered the possession of the said land to the said *George*, who occupied and possessed the same, until some time in March, 1830, when he died. That the said *George*, previous to his death conveyed the said land to the defendant in this cause who is his son, and who resided upon the said lands at the time of his said father's death, and who immediately upon his said father's death took possession of the same, and was seized and possessed thereof, and has continued so seized and possessed thereof until the present time.

It is further admitted in this cause, in addition to facts already admitted, that *John Stewart*, the father of the lessor of the plaintiff, soon after the decision in the Court of Appeals, in June, 1812, in the action of ejectment brought by him against *James Evans*, gave his consent that *Helena Collier*, one of the heirs of the said *Alexander Stewart*, under the act to direct descents, should file a petition for a division or valuation of said *Alexander's* real estate among his heirs at law, under the said act to direct descents that the said petition was filed with the knowledge, approbation and consent of said *John*, who was represented in said petition as one of the heirs of said *Alexander*, under the said act to direct descents, being the same proceeding which is referred to in the statement of facts is this cause heretofore agreed to. That the said *John*, was a party to said proceeding. That from the time of the aforesaid decision against him in the Court of Appeals, he acquiesced in the claim set up by the collateral relations of the said *Alexander*, that they were the heirs at law of the said *Alexander*, under the said

act to direct descents, of the lands in the declaration mentioned. That a certain *Benjamin Dashiell*, of *Somerset* county and *State of Maryland*, and his wife *Matty*, who was a daughter of *William Stewart*, deceased, who was the only brother of the said *Col. John Stewart*, deceased, who was the father of the said *Alexander Stewart*, the intestate, were also made parties to the said proceeding for the division or valuation of said *Alexander Stewart's* real estate. That when the lands in the declaration mentioned, were sold by the said commissioners, the said *John Stewart*, the plaintiff's father, was present and acquiesced in said sale. That the said *John Stewart*, after the aforesaid decision in said Court of Appeals, contracted with the said *Benjamin Dashiell*, by parol without writing, to sell him and his heirs all his, the said *John Stewart's* estate, of, in and to the said *Alexander's* real estate, as hereinafter stated, and that the said *Benjamin Dashiell*, in fulfilment of his said contract, paid the said *John Stewart*, the sum of fifteen hundred dollars in full of said purchase, and directed the said commissioners to place his, the said *John Stewart's* share of the said *Alexander Stewart's* real estate to the use, credit and benefit of said *Benjamin Dashiell*, in their return of the proceedings under said commission. That in pursuance of said direction, the said commissioners did in their return of proceedings dated April 5th, 1814, return that the said *Benjamin Dashiell*, was entitled in right of his wife *Matty*, daughter of the said *William*, and also *John Stewart's* part by his direction, making two-fifths of the one-fourth of said estate, amounting to $3,111 67½. That in consequence of the said sale so as aforesaid made by the said *John*, to the said *Benjamin*, and the payment of the purchase money by him as aforesaid, the said commissioners apportioned the said *John's* share of the said estate to the said *Benjamin*, and that the same was subsequently paid to him the said *Benjamin*, by the purchasers of the said real estate. It is further admitted, that the said *John Stewart*, never did from June, 1812, set up or claim any title of the lands in the declaration mentioned, as heir

at common law of the said *Alexander.* It is also admitted, that the said *Matty Dashiell,* wife of the said *Benjamin Dashiell,* departed this life in the year 1821. It is further admitted that the said *Benjamin Dashiell,* and *Matty* his wife, acquiesced in and consented to the possession of the said *George Jones,* of the said lands. It is further admitted, that the said defendant in this action claims and holds the said lands from the said *George,* and that the said *George,* claimed and held the same in and by virtue of the aforesaid sale made by said commissioners. It is further admitted, that the aforesaid contract, sale and payment of the said *Benjamin,* to and with the said *John,* was in the spring of 1813. It is further admitted, that at the time of the said sale of the said *John* to the said *Benjamin,* both the said *John* and *Benjamin,* believed the said *John,* was not entitled to said lands as heir at common law.

It is also admitted in this cause, that *John Stewart,* the plaintiff's father, duly executed his last will and testament, on the 27th day of January, 1816, and died without revoking the same, and which after his death to wit: on the 23rd day of July, 1817, was duly admitted to probat and record, and which said last will and testament ensues in the following words, to wit:

" In the name of God, Amen. I *John Stewart,* of *Somerset* county and *State of Maryland,* do make this my last will and testament in manner and form following, to wit: I give and devise the houses and lot which I purchased of *Mr. John H. Bell,* in *Princess Ann,* with all the lands which I purchased of *Mr. Isaac Polk,* to my son *James Stewart,* his heirs and assigns forever; also my negro man *Tom,* and boy *Hamilton,* with all the stock and farming utensils which I gave him after his marriage. I give and devise the residue of my estate, both real and personal to my wife, *Jane Stewart,* and my son, *James Stewart,* or the survivor of them, in trust for my wife, *Jane Stewart,* and my daughters, *Elizabeth, Nelly, Matilda,* and *Nancy Stewart,* to be equally divided between them and their heirs forever, with full power in my said trus-

tees to rent, sell, dispose of, and convey the whole or any part thereof, as they shall deem most to the advantage of my said wife and daughters. I hereby appoint my wife, *Jane Stewart*, and my son, *James Stewart*, executors of this my last will and testament, revoking all former wills by me made, ratifying and confirming this to be my last will and testament," &c.

It is also further admitted, that the lands and real estate devised to *James Stewart*, by the said *John*, in the above last will and testament, described as the lot purchased of *Mr. John H. Bell*, and the lands purchased of *Mr. Isaac Polk*, are not the same lands and real estate mentioned in the plaintiff's declaration.

Whereupon the plaintiff by his counsel prayed the opinion of the court and their direction to the jury, that if they believed the testimony offered in evidence as above, that *Alexander Stewart*, was entitled to an undivided moiety of the lands mentioned in the declaration, to wit: "*Dashiell's Lot*" and "*Stevens' Folly*" of which his sister, *Jane*, died actually seized and possessed, by descent as heir to her; and that on the death of *Alexander*, the inheritance devolved on the lessor of the plaintiff, as heir at common law, and is not embraced in the act of Assembly, 1786, ch. 45. Which opinion and direction the court *pro forma* refused to give, whereupon the plaintiff by his counsel excepted.

It is agreed by the counsel in this cause, that if the judgment of court as expressed in this bill of exceptions, should be reversed, a *procedendo* shall be awarded for a new trial.

The verdict and judgment being for the defendant, the plaintiff prosecuted this appeal.

The case was argued before BUCHANAN, Ch. J. and ARCHER, DORSEY, and STEPHEN, Judges.

R. N. MARTIN, for the appellant, contended:

There was but one material question in the cause, which was, whether an estate which descended from a sister to a brother, of which the brother died seized and intestate, was

embraced by the act of 1786, ch. 45, to direct to descents ; or descended as at common law. This question depended upon the construction of that act, and it comes up in an action of ejectment, instituted to recover an undivided moiety of two tracts of land. The plaintiff counts upon two demises, one for an entirety, and one for an undivided moiety, and the facts are stated in the bills of exception, which show that *Alexander Stewart* died last seized, and that the proceedings upon a partition then referred to, were never completed, as the commissioners never executed any deed.

The present plaintiff must recover as the heir at law of *Alexander Stewart*, who died last seized. The prayer presented to the county court includes three propositions :

1. Upon the death of *Jane Stewart*, the moiety of which she was possessed, descended upon *Alexander*, as her heir.

2. That *Alexander's* estate being derived by descent from his sister, descended according to the principles of the common law.

3. If the estate descended at common law, then the lessor of the plaintiff is entitled as heir to *Alexander*, the party last, actually seized.

In the last proposition, the father of the lessor of the plaintiff is not regarded. He is passed by, never having been seized in fact.

The first proposition does not admit of dispute. Upon the death of *Col. John Stewart*, the estate descended to his two children, as tenants in common. There was no partition, but *Jane* died in possession of a moiety. It is true, her estate descended to her, on the part of her father, but when she died seized, she became the new stock. The root of a new stock, and on her death it descended from her, to her brother, as heir to her at common law. In tracing the descent, the court will not look beyond her; the mode of its acquisition by her is immaterial. It is the person last actually seized, from whom the inheritance is to start.

2. This case is not embraced by the act of 1786, ch. 45. A descent from sister to brother, is not governed by it, but by

the rules of the common law, as if that act had not been passed. That act only provides for three classes of cases: 1st. Estates descended on the part of the father. 2d. On the part of the mother. 3d. By purchase; and two rules of interpretation apply to that act. When legal terms are used, they are to be understood in a legal sense; technically, the words "purchase," and "on the part of," used in the act of 1786, are to be construed as at common law. *Barnitz's lessee vs. Casey,* 7 *Cranch,* 468. *Hall vs. Jacobs et al, lessee,* 4 *Har. and John.* 254. And the other rule is, that although it may be granted, you must follow the intent of the framers of the act, still it is the intent discoverable in the language of the act, and not in fancy or conjecture. You may suppose the framers masters of the language used, and that they intended to provide a scheme of descents as comprehensive as new, still the court is confined to the language used. Some persons have supposed that this act, was meant to tear up every fibre of the feudal system, as wrong in principle, and partial in practice; and this may be so, yet if the language of the act falls short of the design, the court cannot remedy the defect. This cause does not belong to the third class. It did not vest by purchase, nor did it descend on the part of the mother. Then the only inquiry is, did the estate of which *Jane,* died seized, descend to *Alexander,* on the part of the father. Descents between brother and brother must be examined into. These are direct, immediate descents, at common law, and are not *by* or *through* the father. So far as such inheritances are concerned, the father is not regarded. He is not the stock from which the inheritance descends. So if the father was attainted, the land will still descend from brother to brother, when it cannot go through the father, who in such case is the stock of consanguinity, and not of descent. *Hall vs. Jacobs et al, lessee* 4 *Har. and John.* 256. *Barnitz's lessee vs. Casey,* 7 *Cranch,* 468. 3 *Salk.* 129. 1 *Ventris,* 416. *Seisina facit stipitem.* This rule makes *Jane,* the stock from which the inheritance descends. The question under consideration, has been decided in the

cases from *Harris and Johnson and Cranch*, above cited; and yet I admit that in the case of *Stewart's lessee vs. Evans*, 3 *Har. and John.* 287, it has been decided, that a descent from a sister to a brother is within the act of 1786; but I assume, that the case last cited was an erroneous exposition of the statute. It is condemned by the common law, and overruled by the case in 4 *Har. and John.* 256. The decision of this court in 3 *Har. and John.* 287, does not operate as a bar in this cause, and if the law is erroneously announced, then this court will correct it. The court is not conclusively bound by the former opinion. *Hammond vs. Ridgely,* 5 *Har. and John.* 245. If the first proposition be established, the lessor of the plaintiff claims as heir of the person last actually seized of the estate, which is the doctrine of the common law. 7 *Har. and John.* 2, note (*a.*) *Chirac et al, vs. Reinecker,* 2 *Peters,* 625. 4 *Kent,* 381, 385. *Jackson vs. Hilton,* 16 *John.* 96. *Jackson vs. Hendricks,* 3 *John. cases,* 214. 2 *Blk. Com.* 146. *Bates vs. Shraeder,* 13 *John.* 260. *Harris et ux, vs. Prichard,* 2 *Wils.* 45. There was no actual *seizin,* on the part of the father of the lessor of the plaintiff at any time, and so is the proof. He failed in a former action of ejectment for the same premises. The possession of his collateral relations was not his possession. The court cannot assume they were his tenants in common, and the *seizin* of one of those relations is not the *seizin* of the others. In short, the success of this cause depends upon how far the court is bound by the case in 3 *Har. and John.* It is in direct conflict with the subsequent case of *Hall and Jacobs,* which overrules it.

W. H. COLLINS, for the appellee.

The argument on the other side, and the success of the plaintiff's cause assumes.

1. That the case of *Stewart and Evans,* 3 *Har. and John.* 287, is not law.

2. That *Captain John Stewart,* was never seized so as

to make him a *stirps* or ancestor; that there is no evidence of his entry on the lands claimed.

3. That the proceedings under the commission to effect a partition was not valid, so as convey title to the person who purchased under it.

Upon the last point, it is supposed, that the question of title under the commission is not now in the cause. The evidence is all from the plaintiff. The prayer assumes, that the inheritance descended on the death of *Alexander*, to the lessor of the plaintiff, yet the record shows that his father, *John Stewart*, survived *Alexander*. This prayer then asks the court to say, that in the interim nothing occurred to shew an entry by *John*, or that the proceeding by commission was legal and passed his estate; that the mistake was merely in the distribution of the proceeds, and that the title still passed to *James*. This brings us to consider the act of 1786, ch. 45, sec. 8. In this act the legislature show they know the meaning of the word *seizin*. The act embraces all *seizins*. *Captain John Stewart*, had a *seizin in law*. But on the other side it is assumed, the act of 1786, meant only a *seizin in fact*, and that the term is used in the same sense as in the rule *seisina facit stipitem*. In the act of 1786, jurisdiction is given to divide the land, in case the parties *entitled* cannot agree upon a division. Does the word *entitled*, mean a *seizin* in deed? The ancestor must be seized in fact, but his heirs are only to be entitled, and that looks merely to the legal title. It is enough if the proceedings which pass the title include the parties *entitled*, in its popular acceptation. There is no *casus omissus*, in the 8th sec. and then although *Captain John Stewart*, had a moiety of the estate at common law, and one-twentieth of a moiety under the act to direct descents, both estates are within the 8th sec. of the act of 1785, ch. 45, and operated upon by the commission. Such an estate is within the mischief to be remedied. It was impossible that the commissioners could act upon any undivided interest in an estate, without acting upon the whole. When they acted upon his one-twentieth

of an undivided half of the land, they necessarily acted upon his undivided half, of the same land.   I conclude, that the commissioners had jurisdiction without a seizin in deed by all the heirs, to divide the estate, or sell it, in case a division could not be had ; and this without disturbing the rule that a *seizin in fact*, is necessary to make an ancestor. ˙ If the proceedings were regular they passed the title.   But it is objected, the commissioners executed *no deed* to the purchaser.   In the case of a sheriff's sale, a deed is not necessary.   *Barny vs. Patterson*, 6 *Harr. and John.* 182. A change of property is effected without a deed, by the legal effect of the proceedings.   *Fenwick vs. Floyd's lessee*, 1 *Har. and Gill*, 172.   *Boring's lessee vs. Lemmon*, 5 *Har. and John.* 223.   *Massey vs. Massey's lessee*, 4 *Har. and John.* 141.   *Hammond et al*, *vs. Stier*, 2 *Gill and John.* 81.   *Stevens vs. Richardson*, 6 *Har. and John.* 156, 258.   *Leadenham vs. Nicholson*, 1 *Har. and Gill*, 267.   *Hurt vs. Fisher*, *Ib.* 88.   Also in cases of election.   A compliance with the terms by the husband of one of the heirs, vests the fee in him without deed.

It might have been inferred in this case, that a deed had been made and the form of the prayer took the question from the jury.   The proceeding by commission was proper, and the only mistake was in the distribution of the proceeds of sale.   It is a judicial sale, and the purchaser is not to look to the application of the purchase money.

We are now to consider three cases, that of *Stewart vs. Evans*, 3 *Har. and John.* 287.   *Hall vs. Jacobs*, 4 *Har. and John.* 287, and in 7 *Cranch.*   They are all correctly decided and consistent.

In the case in 3 *Har. and John.* the descent was as here, and the court there say, that *Alexander's* whole estate descended under the act of 1786.   But in the case of 4 *Har. and John., Jacobs*, the elder, devised his estate before the act of 1786.   The court decided it to create an estate by purchase.   And as the brother took an estate of that character, and not by descent, it was held a *casus omissus*, in the rules

of descent prescribed by the act. The case of 7 *Cranch*, was a descent from half blood to half blood, against all the rules of the common law; and in these particulars, the two cases differ from the decision in 3 *Har. and John.*, and like the common law, takes a distinction between purchased and descended property, the mother's relations never inheriting the latter where derived *ex parte paterna.* The effort of counsel, also was to get up a constructive descent; but neither in the case in 3 *Har. and John.* nor in this, is there any necessity for it, as in both there was an actual descent. Technical terms are to be preserved, and the technical meaning of the terms " on the part of the father" maintained. These are common law terms. 2 *Tho. Co.* 169, 170, *No. O.* when an estate has really descended on the part of the father, the strict feudal law is preserved. Descents on the part of the father flow from him either, mediately, or immediately. You trace the history of the fee, and if no other title intervene, the blood of the ancestor takes. But the estate by purchase has a more fluctuating quality. It goes either to the father or mother; yet if the history of the fee can be traced, the blood of the first purchaser takes. 2 *Black.* 220, 223. The law follows the fact. An ancient fee, none but the blood of the first purchaser can take. If it be *antiquum* by fiction, the mother's blood may inherit, and this rule distinguishes this cause from 4 *Har. and John.* 245, and also 7 *Cranch*. This is a feud *antiquum et veterum*, a line of unbroken descents *ex parte paterna*, 2 *Thos. Co.* 170, *No.* 20. The touchstone is, can the father or mother take the property. It is one of the dividing points of the law, and this answers any supposed discrepancy between the case in 3 *Har. and John.* 287, and 7 *Cranch*. The courts deciding those cases have placed them on that very doctrine. The language in *Cranch*, refers to an estate by purchase; it is guarded, and if an authority were wanting to show the question now under consideration, to be open, it would be found there; moreover, its language must be limited to the special circumstances of the case. So when the judge speaks of a

descent from brother to brother as an immediate descent, he means of an estate acquired by purchase. Any other construction would make him depart from the whole line of his argument, the facts of the cause, the reason of the thing, and the principles of the common law. There is nothing new in his view of it, but like things dug up out of an ancient mine by others who have explored it before us, and now by us first seen appear new. The case in *Munford*, relates only to a descent from the father, and turns upon the words of the *Virginia statute*, which does not use the terms of the common law, " on the part of the father." The case in 3 *Har. and John*. 287, is like the present, except that a partition there is conceded, still *Jane*, would be in by descent from her father, 1 *Thos. Co*. 726, 727, *note (t.)*

ⱡ The case of *Hilliard vs. Moor*, 2, *N. C. Law Rep*. 590, referred to in 2 *Peters, S. C*. 58, is precisely that of the cause under consideration, and a decisive authority with the defendant. The meaning of the words on the part of the father is illustrated by *Shippen vs. Izard*, 1 *Serg. and Raw*. 225. *Bevan vs. Taylor et al*, 7 *Serg. and Raw*. 397.

This is a paternal fee and on the part of the father. The same rule applies in estates of gavel kind. I conclude, that the common law meaning of the words on the part of the father, is that none can take, but of his whole blood, and determining who is the heir that principle is the corner stone. A descent from brother to brother of a descended estate, is a mediate descent on the part of the father. So from uncle to nephew. So from cousin to cousin. So in all cases, when the heirship is traced through the blood of the father of a deceased tenant without children. These are cases of constructive descent. The case in 4 *Har. and John*. 245, relates to estates by purchase, and conforms to the common law and its fictions, but here no fiction is necessary. The legislature relied upon the correct judgment of this court in 3 *Har. and John*. 287, and in the act of 1820, did not provide for such a case, but the difficulties flowing from the decision in 4 *Har. and John*. 245, as provided for in that act.

The remaining branch of the cause involves the *seizin* of *Captain John Stewart.* The prayer to the county court, assumes he was not seized. The jury might have presumed an entry. *Evans,* in possession, was an overseer for *Alexander,* at his death; he inhabited the mansion house, and claimed the property on the part of the co-heirs. *John's* right accrued more than twenty years before this action commenced. He lived more than seven years after his right accrued, and *Evans,* the overseer, set up no exclusive right to the property, and yet the prayer assumes the fact, of no evidence of *seizin* fit to be submitted to the consideration of the jury.

I maintain, that this record shows a *seizin in fact,* by *Captain John Stewart.* If so, he was within the act of descents, and having left children, the nature of his title is immaterial; *Evans,* was a tenant in common, and his entry is that of all, in law. If lawful, it gives *seizin* to all cotenants, and to all parceners unless to their disadvantage, as where the entry is illegal, 1 *Tho. Co.* 681, *No. C.*

I am not now contending, that *John* was seized of that part of the estate, which it is conceded descended to him under the act of 1786; yet the entry of *Evans,* for all the parceners is necessarily an entry for *John's* statutory interest. The doctrine of *possessio fatris,* applies, 2 *Tho. Co.* 180, *No. W. Hornblow vs. Read and Pidduck,* 1 *East.* 569. Without an ouster found by the jury, the possession of one tenant in common is the possession of all. *Seizin in fact,* as well as ouster are matters of fact, and *prima facie,* the possession of one is the possession of all; and so in all cases, unless the contrary is found by the jury. An ouster, is some act adverse to the possession of another excluding him, sometimes it is presumed. *Gill and wife vs. Pearson,* 6 *East.* 181, 182. When an entry is unlawful, these doctrines are not applied. 1 *Hob.* 120. 4 *Kent.* 365, 6, 382. 2 *Cru. Tit.* 20, *sec.* 14, 15. 3 *Cru. Tit.* 29, *sec.* 60, 61. 3 *Serg. and Raw.* 385, 386. *Evans,* was a co-heir. He went into possession for all the co-heirs. *John's* interest of one-twentieth of

3    v. 8

this estate, which descended under the statute he was in of, by *Evans'* entry. *Evans'* denial of the extent of *John's* right, is not material; for once in, the law remits him to his lawful right. So that whatever right *John* had, he was seized of in fact by the entry of *Evans*, and this makes *John* a *stirps.* Possession of part of a tract with title to the whole tract, gives possession according to title ; without title, the possession is restrained to the *pedis possessio. Lloyd vs. Gordon et ux*, 2 *Har. and McHenry*, 260. *Ridgely's lessee vs. Ogle et al*, 4 *Ib.* 129. *Hammond vs. Ridgely*, 5 *Har. and John.* 245. *Ib. McHenry's Eject.* 178. *Barr vs. Gratz*, 4 *Wheat.* 223. This principle more strongly applies to the cause under argument. It was always the law, that a party cannot be disseized of an undivided interest, nor abated, nor intruded upon, while he has possession. He cannot be in of part, and not of the residue, of an undivided interest. *Reading vs. Rawsterne*, 2 *Ld. Ray.* 29. *Ib. Hob.* 122, 322. The principles relied upon and their doctrines are illustrated by various cases and decisions. 3 *Tho. Co.* 180. *Litt. sec.* 695. 2 *Tho. Co.* 465, *No. Z.* 1 *Tho. Co.* 767. *Litt. sec.* 306. 2 *Tho. Co.* 350. 2 *Tho. Co.* 299. *Litt. sec.* 701. *Ricard vs. Williams*, 7 *Wheat.* 106. 3 *Co.* 53. *Litt. sec.* 399. *Tho. Co.* 48, *No. Y.* 2 *Tho. Co.* 180, *No. U.* 1 *Cru. Tit.* 1, *sec.* 32. *Carroll vs. Norwood*, 5 *Har. and John.* 174. 1 *East.* 575. 2 *Cox's Cases*, 383. *Smith and another vs. Stewart*, 6 *John. Rep.* 37. *McHenry on Eject.* 167. 3 *Tho. Co.* 16, *No.* 1. 3 *Tho. Co.* 79, 88. *Plow.* 142. *Johnson vs. Howard*, 1 *Har. and McHenry*, 289. I conclude, that *Captain John Stewart*, at the death of *Alexander*, was seized in fact by the entry of *Evans*, and that the extent of *John's* undivided interest is not material, that whatever it lawfully was, he was in of it by operation of law, and so had a *seizin in fact*, to make him an ancestor from whom the land would descend at his death. This result sanctions the judgment of the county court.

W. W. HANDY, also for the appellee, further contended.

That the prayer in the cause was properly refused, as it put matter of law to the jury, and was defective under the act of 1825, ch. 117.   It called upon the court to say, that the lessor of the plaintiff was heir at common law to *Alexander.* The court refused, and none can tell from the phraseology of the prayer, the grounds of that refusal.   Whether it was that the court denied the assumption of the prayer that *Captain John Stewart,* was never seized; or that he was a tenant in common; or that the jury might presume an entry; or that he was not heir at common law; or that he had the entirety; or that it put matter of law to the jury; or that upon the death of *Alexander,* the inheritance did not devolve on *Captain John Stewart.*   These may, or may not have occupied the attention of the county court.

A deed from the commissioners was not necessary to complete the title under the commission.   Under the act of 1786, ch. 45, which authorized a division of the estate, no deed was made essential; nor was any provision made for a deed until 1799.   It was adopted not as completing the title, but as evidence of title.   Purchasers between 1786 and 1799, under such proceedings took the legal estate.   Electing heirs need not take a deed, nor purchasers from sheriffs.   *Stevens vs. Richardson,* 6 *Har. and John.* 157.   *Boring vs. Lemmon,* 5 *Har. and John.* 225.   1820, *ch.* 191.   1802, *ch.* 94, *sec.* 5.

The *seizin* of *Captain John Stewart,* was established in this cause, of part under the act to direct descents, and part it is said at common law.   The overseer of *Alexander,* who was in possession at his death, was a mere tenant at will, which is sufficient evidence of a *seizin* to go to the jury.   There was no actual ouster in the cause, and *Evans'* lawful entry enured to the benefit of all.   *Fisher et al, vs. Prosser, Cowper,* 217.   Ouster is a question of fact for the jury, 2 *Tho. Co.* 180; when it is an inference from other facts, it is exclusively for the jury.

The cause has been before decided.   The case in 3 *Har. and John.* 287, is decisive of the question.   It related to the same lands, the same descent, and it depended on the same

facts; and it was then held to be an estate descending on the part of the father. Now this court is called on to say, that in 4 *Har. and John.* 245, they overruled the case in 3 *Har. and John.* Upon that assumption this ejectment was instituted. The case in 3 *Har. and John.* was fully discussed by able counsel, and the actual question could not be avoided. The record disclosed but a single point, which is decisive of the point now debated. If this is not so, the rule of *caveat emptor*, would teach us to beware of our judicial officers, and courts could no longer take refuge under the salutary maxim *stare decisis.* The defendant, my client, bought under the authority of the decision announced in 3 *Har. and John.* He is an innocent purchaser, and I have no fear, that vague notions of alleged conflicting rules of decision, will uproot the possessions of the innocent. Some deny the right of reversing opinions, in the abstract. Nothing but great necessity can reduce a court to reverse its own solemn judgment; and cotemporaneous constructions of statutes are respected, though doubted. A judicial decision cannot have less weight, for to this, all persons must refer as a rule of conduct. 7 *Peter's S. C.* 543. *Hammond vs. Ridgely*, 5 *Har. and John.* 245.

There was evidence to prove a partition, which in principle deprives the court of the power of assuming there was no partition according to the hypothesis of the plaintiff's prayer, *Davis vs. Leab*, 2 *Gill and John.* 302. *Gale vs. Lankford*, *E. S. June*, 1833.

By the act of 1798, ch. 101. sub. ch. 1, it is declared, "that all lands, tenements and hereditaments, which might pass by deed, or which would in case of the proprietors dying intestate descend to his heirs and except estates tail, shall be subject to be disposed of by last will and testament, &c."

This act differs from the *English* statute of wills; the word *having*, in that statute relates to *seizin*, legal or equitable, and the estate here claimed is affected by the residuary clause of *Captain John Stewart's* will, made in 1816. He had such a *seizin*, as would enable him to make a good deed of bargain and sale, and consequently his estate no matter how

acquired, passed under his will. Upon the question whether actual possession in the grantor is necessary to constitute a valid, deed of bargain and sale from him. He cited, *Mason's lessee vs. Smallwood,* 4 *Har. and McHenry,* 484. *McKeel's lessee vs. Woolford, Ib.* 495. *Lewis' lessee vs. Beall, Ib.* 488. *Ridgely, et al, lessee, vs. Britton, Ib.* 507. *Goodwin vs. Hubbard, et al,* 15 *Mass.* 214. *McHenry on Eject.*

NELSON, for the appellant, in reply :

After adverting to the facts, he insisted that the cause was properly before the court, and within the act of 1825. The prayer does not attempt to dispose of the whole cause as in *Davis vs. Leab,* but only calls upon the court to instruct the jury upon the law of heirship applied to these parties, on the principles of the common law. No other question is decided, and the prayer asks for two specific directions, both of which appear : these only can be reviewed.

The proceedings in *Somerset* county court were void. The ratification of the sale did not pass title without a deed. No matter what equitable estate passed, the legal did not. These proceedings are specially regulated by law, and whether the title claimed is by election or purchase, the prescribed course must be pursued. Now although under the act of 1786, no deed is directed, yet the act of 1799, makes it the duty of the commissioners to execute a deed of conveyance, to evidence the title of the purchaser. The obligation to convey, is now doubted for the first time. The general impression is otherwise, and we find a crowd of laws passed to supply defects in such deeds, and omissions arising from the death of commissioners. The deed is decided to be necessary by two or three classes of cases :

1st class.—Proceeds of sales of an estate sought to be reached by husband. These cases only decide, that the character of the proceeds are changed upon sale and ratification, but this does not affect the legal title. The change is effected by judicial power. They merely relate to the conversion, and not the legal title.

2d class.—Are cases of election, under act of 1785. Two of them, one from *Somerset*, one from *Harford*. The last was upon an election to take the estate, but. the party had not executed the bonds, nor paid. the purchase money; decided that the title did not pass until all the requirements of the law were fulfilled, and this was at a time, when the commissioners were not bound to give a deed. In the *Somerset* cause, the title in the party electing was complete upon election. All the acts to be done by him, had been done, and the law did not require a deed. *Stevens vs. Richardson,* 6 *Har. and John.* 156. This case affirms my view, that no deeds were necessary in cases of election.

3d class.—As to purchasers the law is different under the act of 1785, the same question decided *Massey vs. Massey's lessee,* 4 *Har. and Johns.* 141. This conforms to all the laws respecting the enrolment of deeds, and the general policy of the law, and applies to most cases where titles are to pass.

In purely judicial sales at common law, deeds are not necessary. These proceedings never divested the title of *Captain John Stewart,* and the descent was never intercepted in its passage to the lessor of the plaintiff. I admit that if *John* was ever seized of this property, it would descend to his children, or pass under his will. This action is not brought to recover the entire estate of *Alexander,* but a moiety of it, which it is contended, descended according to the principles of the common law, and the true inquiry is, whether *Captain John* was ever so seized of that moiety, as to bar his eldest son. In *Maryland,* there must be a concurrence of a right to, and actual seizin of the estate to do that. Actual seizin is not pretended. Constructive possession is relied on. This is a clear case of ouster by abatement. One-half of the estate descended under the act of 1786, and in this the lessor of the plaintiff had one-twentieth; of the other one-half, he was owner of all. In regard to one, they were parceners by descent; as to the other, if our theory be true, they had no interest—as to this, not tenants in com-

mon—no unity of title; there was only unity of possession. How are they seized? *per my* in *severalty*, and only so seized; not *per tout*, as parceners or joint tenants. Has there been an ouster of this moiety? I consider a seizin of an interest in the estate, in him, but not the whole of the undivided moiety. The authorities relied on, all rest on principles in conflict with the facts in this cause. Where one tenant goes into possession of an estate in common, his entry shall enure to all. What is the reason of this rule? The law does not presume a wrong; it subordinates his possession to his title; makes him steward for the others. Such is the extent of the doctrine, and all the books refer to *Coke:* therefore in regard to the one-twentieth which descended under the statute, the possession of *Evans*, was the possession of all the collateral relations claiming the estate. The principle that a party cannot be disseized of an undivided moiety, has reference to one in actual possession, and arises only upon a conflict for possession. It cannot apply to *Captain John Stewart*, as he never was seized. The use made of this doctrine is, to pervert the adverse entry, and claim of *Evans*, into an admission of *John Stewart's* title. *Evans'* conduct is a clear ouster. He says the title is not yours; one-twentieth was not in controversy, but as to all the rest, *Evans* entered, and remained in, under an adverse title. Abatement is one of the means of bringing about an ouster; it is the entry of one, not having title. *Evans* was in by wrong—by deforcement, and the only remedy is ejectment. The conduct of *Evans*, showed the character of his entry. If adverse, it cannot enure to his co-tenant. *Davenport vs. Tyrrel*, 1 *Wm. Black.* 675. The intent prevails against the legal presumption; the acts, conduct, and declaration of the party entering, give rise to a different rule. These principles show it cannot be a case of constructive seizin.

It is said the fact of seizin was taken from the jury, by the assumption of the rejected prayers. It was not their province to decide upon it. What facts constitute seizin is a

question of law—whether they exist, is for the jury. But here, the facts are admitted; when there is no fact in dispute the seizin is for the court, and I answer a similar objection upon the subject of partition in the same way.

The power to will this estate, is put upon the ground of a power to convey it, and to make such a devise, the estate must have a capacity to descend; this, therefore depends upon the same question of actual seizin.

The only remaining question is, upon the act of 1786. The two decisions on that act, cannot be reconciled in principle. They differ in circumstances, but conflict in principle. I have no disposition to disturb settled rules of decision, nor do I deny, that vacillation of opinion, is not attended by serious consequences, but error should be corrected as occasion demands; an adherence to error, would be monstrous. It is an open question, within the power of the court, and they may correct either of the decisions, of *third* and *fourth* *Har. and Johns.* if either be incorrect, or harmonize, if they be harmonious.

The principle of *Hall and Jacobs* is, that having derived the estate *collaterally*, it was not within the act of 1786. It decides that no case of a descent from brother to brother is within the act; that taking an estate from the brother, it did not descend on the part of the father; not a lineal, but an immediate descent, and therefore, not a paternal estate, which is just the case at bar. *Jane Stewart*, had no common law estate. It would not have descended to her heirs at common law, except under particular customs. Then from whom does *Alexander* inherit? From his sister, which is not provided for by the act of 1786. By the act of 1820, this case is provided for, which shows that the legislature understood the first decision in 3 *Har. and John.* to have been overruled.

,STEPHEN, Judge, delivered the opinion of the court.

This action of Ejectment was instituted in the court below to recover two tracts or parcels of land called " *Dashiell's*

*Lot*" and " *Stevens' Folly.*" The declaration contained two counts, one for the entirety, the other for undivided moieties. The lessor of the plaintiff claims to recover as heir at common law, of a certain *Alexander Stewart*, who departed this life sometime in the year 1810. The land in controversy descended to *Alexander*, from his sister, *Jane Stewart*, who died seized thereof in the year 1797, intestate, and without issue, leaving the said *Alexander*, her brother, and only heir at law. The title of *Jane*, was derived by descent from her father, *Col. John Stewart*, who departed this life sometime in the year 1794, her brother, *Alexander*, being her brother of the whole blood, and who was also a son and heir of the said *Col. John Stewart*. The said *Jane* and *Alexander*, being the only children and heirs at law, of the said *Col. John Stewart*. The defendant claims title under the commission issued from *Somerset* county court, on the petition of one of the collateral heirs of the said *Alexander*, claiming title to a part of said lands under the act of descents of this *State*; the said *Alexander*, having died as aforesaid, intestate and without issue. The lessor of the plaintiff claims his title as heir at common law, of the said *Alexander Stewart*, as the oldest son of the said *John Stewart*, who was the oldest son of *William Stewart*, who was the only brother of the said *Col. John Stewart*. The question therefore to be decided by this court, is, whether on the death of *Alexander*, intestate and without issue, the lands in controversy descended from him to his collateral heirs under the operation of the act of descents of this *State*, or to the lessor of the plaintiff as his heir at common law. *Capt. John Stewart*, the father of the lessor of the plaintiff, departed this life sometime after the death of the said *Alexander Stewart*, without ever having been actually seized as is alleged of the lands, to recover which this action of ejectment was instituted. The solution of the question arising in this case depends upon the nature of the title under which *Alexander Stewart*, held the property in controversy at the time of his death. On the part of the lessor of the plaintiff it is contended, that he took it by immediate descent from

4    v. 3

his sister, as her heir at common law, and that therefore the lessor of the plaintiff is entitled to recover as his heir, accord ing to the rules and canons of descent as fixed and establish- ed by that law ; on the part of the defendant it is contended, that although he took it by immediate descent from his sister, yet as it descended to her from their common father, it was a descent to him on the part of the father, and is therefore operated upon by the express provisions of the act of de- scents of this *State.* According to the principles of the common law of *England,* as well as the act of descents of this *State,* descents are either lineal or collateral, and both may be either mediate or immediate. The immediate lineal descent at common law, is from the father to his son, the immediate collateral descent is from one brother to another. The me- diate, when one derives his inheritable blood to another by the medium of a third person ; as in lineal descent, if a son claims as heir to his grandfather, or great grandfather, it shall be *mediante patre,* though the father be dead at the time of the descent ; so in a collateral descent from a nephew to an uncle, or from an uncle to a nephew, it shall be made *mediante patre,* 3 *Comyn's Digest,* 408, 409. In 2 *Black. Com.* 223, it is said " it must be observed, that the lineal ancestors though (according to the first rule) incapable them- selves of succeeding to the estate, because it is supposed to have already passed them, are yet the common stocks from which the next successor must spring ; and therefore, in the *Jewish* law, which in this respect entirely corresponds with ours, the father or other lineal ancestor is himself said to be the heir, though long since dead, as being represented by the persons of his issue, who are held to succeed not in their own rights as brethren, uncles, &c. but in right of representa- tion, as the offspring of the father, grandfather, &c. of the deceased. But though the common ancestor be thus the root of the inheritance, yet with us it is not necessary to *name* him, in making out the pedigree or descent. For the descent between two brothers, is held to be an immediate descent ; and therefore, title may be made by one brother, or

his representative to or through another, without mentioning their common father. If *Geoffrey Stiles*, hath two sons, *John* and *Francis*, *Francis*, may claim as heir to *John*, without naming their father *Geoffrey*; and so the son of *Francis*, may claim as cousin and heir to *Matthew*, the son of *John*, without naming the grandfather; to wit: as son of *Francis*, who was the brother of *John*, who was the father of *Matthew*. But though the common ancestors are not named, in deducing the pedigree, yet the law still respects them as the fountains of inheritable blood; and therefore, in order to ascertain the collateral heir of *John Stiles*, it is first necessary to recur to his ancestors in the first degree, and if they have left any other issue besides *John*, that issue will be his heir. On default of such, we must ascend one step higher to the ancestors in the second degree, and then to those in the third and fourth, and so upwards *in infinitum*; till some couple of ancestors be found, who have other issue descending from them besides the deceased, in a parallel or collateral line. From these ancestors the heir of *John Stiles*, must derive his descent." Though therefore, according to the principles of the *English* law of descent, the descent from brother to brother is held to be immediate, and title may be made by one brother to another without mentioning their common father, yet the law still respects the father as the fountain of inheritable blood. From these principles it seems to follow, that though the descent from brother to brother is held to be an immediate descent, yet the title of the brother as heir, must be founded upon a descent from the same pair of common ancestors, as the fountain of inheritable blood. Although therefore, the descent from brother to brother is immediate, yet as the brother derives his inheritable blood by descent from their common father and mother, the descent is also mediately from them; because we have seen, that according to the doctrine as laid down by *Comyn*, in his digest, a mediate descent is "where one derives his inheritable blood to another by the medium of a third." Here we think we might safely stop, and from the proceeding principles of the

common law, legitimately draw the conclusion, that the descent from *Jane*, to her brother *Alexander*, though an immediate descent according to the principles of that law was still mediately from the father from whom *Alexander* derived his inheritable blood, and was therefore on the part of the father, and consequently embraced within one of the classes of the law of descents of this *State*. But there are other considerations which we think have a considerable bearing upon this case, to which it is proper we should advert. In the year 1786, the legislature of this *State*, impressed with a conviction that the rules and canons of descent as established in *England*, and which originated from the feudal system, were contrary to justice, and ought to be abolished ; framed a new scheme or system of descents, in many of its features essentially variant from that adopted and prevailing in *England ;* by that law, new capacities of inheriting was created, unknown to the common law of *England.* It provided that on the death of the intestate, and on the failure of lineal heirs in the descending line, if the estate descended to the intestate on the part of the father, the estate should descend to the brothers and sisters of the intestate of the blood of the father, without discriminating between those of the whole or the half blood ; so that *Alexander,* though only of the half blood to his sister, *Jane,* would have taken as her heir, equally as if he had been of the whole blood under the operation of the law of descents of this *State ;* and in such case, as he would have been excluded according to the principles of the common law, it is manifest he could only have taken on the ground of deriving his inheritable blood to his sister, from or through the father, and consequently by the medium of the father. The descent therefore to him, though immediately from the sister, was mediately from the father, and consequently must be deemed a descent on the part of the father. Under a similar aspect this question has been viewed by the *Supreme Court of the United States*, in a case reported in 2 *Peter's S. C. Rep.* 58. In that case as here, the property in dispute descended from the

mother to her three children, who were two sons and a daughter; the two sons died intestate, and without issue, and on their deaths, their shares of the estate descended to their surviving sister. The sister then died intestate, and without issue, and in order to decide the rights of the parties litigant in the action of ejectment there pending, it became necessary to decide the character of the descent, by which the sister held the two-thirds which passed to her by descent from her brother, and if it was to be considered as a descent from the mother, under the law of descents of the *State of Rhode Island,* where the suit was brought, the lessors of the plaintiff had no title, if not, they were entitled to recover. Judgment was given for the plaintiff, and *Mr. Justice Story,* in delivering the opinion of the court, uses the following expressions: "The estate originally came from *John Collins,* by devise to his daughter, *Mary Collins,* and by descent from her to her three children, and mediately as to the two-thirds, to the intestate through her brothers." The descent to the surviving daughter from her mother, he of course held to be immediate; but as to the two-thirds, which passed to her from her brothers, whom she survived; he held the descent from the mother to be a mediate descent, and not immediate, and being a mediate descent from the mother, though not an immediate one, it was still a descent on the part of the mother. It is to be observed, that the question arising in this case, does not now for the first time come before this court for its decision. More than twenty years ago, the very point now in controversy was presented to this court for adjudication; the case in which it arose may be found reported in 3 *Har. and Johns.* 287, and we are happy to find, that under all the lights we have since received, we discover no cause to dissent from the opinion there given, and that the rule of property then established, may consistently with principle be still held sacred and inviolable. It is much to be regretted, that in deciding the above case, the court gave no reasons for the judgment which was rendered; but we have the argument of the counsel for the appellee, who was

the successful party; by whom it was contended, that the rules and principles of the common law had nothing to do with the case, but that it depended on the true construction of the act to direct descents, meaning the act of 1786, ch. 45. They contended, that the land descended immediately from the sister, and mediately from the father, and that although the descent was not from or through, yet it was on the part of the father.    Whether this argument of the appellee's counsel was adopted by the court to its full extent, the report of the case does not inform us; but it is clear from the result, that the decision was founded upon the principle, that the descent from the brother, who last died seized, was .not governed by the doctrines and principles of the common law, but was controlled and operated upon by the act of descents of this *State*.    It has been contended in the argument of this case, that the decision of the court in that case, is in conflict with the decision since made by this court in the case of *Hall vs. Jacobs*, reported in 4 *Har. and John.* 245.    But we cannot acceed to this proposition; and we think that the two cases so far from being identical, are essentially dissimilar in a most prominent feature.    In the case last mentioned, *Joseph* and *Rachael Jacobs*, from whom the property descended to their brother, *Dorsey Jacobs*, the intestate, acquired it by purchase as devisees under the will of their father *Richard Jacobs;* it was not therefore as here, a case of descent, but of purchase; and upon that ground the opinion of the court seems to have been founded; for we find, that the present chief judge, by whom the opinion of the court was delivered, after deciding that the estate which was vested ·in *Dorsey Jacobs*, by purchase, under the will of his father was embraced by the act of descents, and on his death descended to his brothers and sisters of the half blood, uses the following language, " with respect to the two-thirds of the land, which were vested in *Joseph* and *Rachael Jacobs, by purchase*, under the will of their father, *Richard Jacobs*, there appears to be more difficulty," and after adopting a course of reasoning to shew that they did not vest in *Dorsey Jacobs*, by purchase,

and consequently did not descend to his brothers and sisters of the half blood, he comes to the conclusion, that it was not an estate which descended to him either on the part of the father, or on the part of the mother, and was not therefore within either of those two classes of cases, and could not consequently descend to the lessors of the plaintiff equally." and he ultimately came to the conclusion, that the land in question passed by immediate descent to *Dorsey Jacobs*, from his brother and sister, *Joseph and Rachael*, who acquired it by purchase, and on his death intestate and without issue, leaving no brother or sister of the whole blood, it descended at common law to his uncle, *John Jacobs*, the brother of his father of the whole blood, to the exclusion of his two aunts, *Elizabeth Walker* and *Hannah Fowler*. In another part of the opinion he says, " by the common law, if a man purchases land, he is by fiction understood to hold it *ut feudum anti- quum*, not as land descended either *ex parte paterna*, or *ex parte materna*, for the law will not ascertain it, but as an estate derived to him from some unknown ancestor, and if he dies intestate and without issue, it will go first to the heirs on the part of the father, and on failure of such heirs, then to the heirs on the part of the mother, the males being always preferred to the females, and amongst males, the right of primogeniture prevailing." And he finally decides, that the land in controversy having passed by immediate descent to *Dorsey Jacobs*, from his brother and sister, *Joseph* and *Ra- chael*, who acquired it *by purchase*, on his death intestate and without issue, leaving no brother or sister of the whole blood, it descended to his uncle, *John Jacobs*, as his heir at com- mon law. From the preceding view of this case we think it clear, that the opinion of the court in *Hall vs. Jacobs*, was essentially placed upon the fact, that *Joseph* and *Rachael Jacobs*, from whom the estate descended to *Dorsey*, having acquired it by purchase, and not by descent from their father, it could not be considered as descending to him mediately from the father, and consequently was not embraced by the act of descents of this *State*, as property descending on the

part of the father ; we therefore think, that the two decisions of this court, reported in the third and fourth of *Har. and John.* so far from being in conflict, are in perfect harmony with each other, and that there is no discrepancy between them.

JUDGMENT AFFIRMED.